## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| JOHN ELZIE KINARD, JR. | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO.: |
| | ) | |
| v. | ) | **<u>JURY TRIAL DEMANDED</u>** |
| | ) | |
| LEXISNEXIS RISK SOLUTIONS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

John Elzie Kinard, Jr. ("Plaintiff" or "Mr. Kinard"), a living, breathing, 72 year-old consumer, brings this Complaint against Defendant LexisNexis Risk Solutions, Inc. ("LexisNexis" or "Defendant"), by and through his undersigned attorneys, and respectfully alleges as follows:

### <u>INTRODUCTION</u>

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage,

1

both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, LexisNexis acknowledges this potential for misuse and resulting damage every time it sells a consumer report regarding a given consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, insurance companies, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, insurance, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.      To accomplish Congress' goals, the FCRA contains a variety of requirements to protect consumers, including § 1681e(b), which is one of the cornerstone provisions of the FCRA.

Whenever a consumer reporting agency prepares a consumer report, § 1681e(b) requires the consumer reporting agency to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. § 1681e(b). This section imposes a high, and often disregarded, standard on consumer reporting agencies. *See, e.g.*, *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011) (breaking down the requirements of § 1681e(b), and explaining that "'assure' means 'to make sure or certain: put beyond all doubt,'" "'[m]aximum' means the 'greatest in quantity or highest degree attainable[,]' and 'possible' means something 'falling within the bounds of what may be done, occur or be conceived.'" (quoting *Webster's Third New International Dictionary* 133, 1396, 1771 (1993)).

8.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

9.      In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

3

10.     LexisNexis is a consumer reporting agency that complies and maintains files on consumers on a nationwide basis. As part of this process, LexisNexis uses a largely automated and systematic procedure to assemble and merge consumers' credit histories and credit scores from the repositories of the national credit bureaus, Equifax, Experian, and Trans Union (hereinafter, the "national credit bureaus"), into consumer reports, which LexisNexis sells to various users, including insurance companies. However, LexisNexis does not have adequate procedures to ensure that the credit information and scores it obtains from the national credit bureaus' repositories, and reports to users, is maximally accurate. For example, if one or more of the national credit bureaus' repositories reports that a given consumer is "deceased" and has no credit score, LexisNexis has no independent procedure to verify whether said consumer is, in fact, deceased and does, in fact, not have a credit score. LexisNexis's failure to implement and follow such a reasonable procedure is a violation of 15 U.S.C. § 1681e(b) because LexisNexis has not implemented reasonable procedures to assure the maximum possible accuracy of the consumer report that it furnished regarding Plaintiff.

11.     This action seeks actual, statutory, and punitive damages and costs and attorneys' fees for Plaintiff against LexisNexis for its willful and/or negligent violations of the FCRA, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

## **THE PARTIES**

12.     Plaintiff John Elzie Kinard ("Plaintiff" or "Mr. Kinard") is a natural person who resides in the City of Stockbridge, State of Georgia, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

13.     Defendant LexisNexis Risk Solutions, Inc. ("LexisNexis" or "Defendant") is a corporation headquartered in Alpharetta, Georgia, and regularly conducts business within the State of Georgia.

14.     LexisNexis is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). LexisNexis is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

15.     LexisNexis is also a "reseller" as defined at 15 U.S.C. § 1681a(u), which is a "consumer reporting agency that—(1) assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities; and (2) does not maintain a database of the assembled or merged information from which new consumer reports are produced."

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Defendant resides in this District.

## FACTS

**Defendant's Practices Concerning the Sale of Reports on the "Deceased"**

18. Defendant sells or resells consumer reports (often called "credit report," "reports," "tri-merge reports," or "CLUE report") and credit scores to various markets, including but not limited to the mortgage financing and lending industry and the insurance industry.

19. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

20. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

21. Defendant routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources, such as banks, debt collectors, and the national credit bureaus, that a given consumer is deceased.

22. Defendant's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2, or by using other various codes to indicate a consumer is "deceased" and has no reportable credit score.

23. Defendant does not request or require a death certificate from any of its data sources, which advise that a consumer is "deceased," before placing a "deceased" mark in that consumer's consumer report.

24. Defendant does not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

6

25.     Defendant does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

26.     In some cases, in order to assure accuracy, Defendant may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their LexisNexis credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant has no procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code (or other code indicating a consumer is purportedly deceased) is furnished to Defendant to be placed in said consumer's consumer report.

27.     Defendant employs no procedures *at all* to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

28.     Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant employs no procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark in that consumer's report.

29.     Even in instances where the purportedly deceased consumer communicates directly with Defendant, Defendant employs no procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

30.     Defendant knows that third party credit issuers require a credit score in order to process a given credit application.

7

31.     Defendant knows that consumers without credit scores are unable to secure any credit from most credit issuers.

32.     Defendant knows that living consumers are routinely turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

33.     Defendant has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

34.     Defendant has received and documented many disputes from consumers complaining that their LexisNexis consumer report had them erroneously marked as "deceased."

35.     Defendant knows that thousands of consumers are erroneously marked as "deceased" on their LexisNexis consumer reports via an erroneous furnishing of the "X" code (or other code indicating a consumer is purportedly deceased), even when said consumers are, in fact, alive.

36.     Nevertheless, Defendant employs no procedures to assure that a consumer marked as "deceased" by one or more of the national credit bureaus' repositories is, in fact, deceased.

37.     Even consumers who dispute the erroneous "deceased" status on their LexisNexis consumer reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code (or other code indicating a consumer is purportedly deceased) in the first instance decides to change its respective coding.

38.     Defendant has no independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

8

39.     Nor does Defendant employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

40.     Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

41.     Defendant profits from the sale of reports on deceased consumers.

42.     Defendant knows that truly deceased consumers do not apply for credit.

43.     Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant to be a common and major source of identity theft.

44.     Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

45.     Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

46.     Defendant has no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of its reports who access the purportedly deceased consumer's information.

47.     Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a purportedly deceased consumer's credit history and/or report.

9

48.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendant to sell his or her consumer report, absent a court order.

49.     Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the purportedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**State Farm Insurance Denies Plaintiff's Credit Application to Obtain Automobile Insurance in May 2019**

50.      In or about May 2019, Mr. Kinard attempted to obtain automobile insurance through State Farm Insurance ("State Farm") in Atlanta, Georgia, and submitted a credit application.

51.     Mr. Kinard was shocked when the State Farm insurance agent mentioned that there was a "problem" with his credit reports.

52.     Mr. Kinard takes great pride in his good name and established credit rating, and he works hard to ensure that his bills are paid in-full and on-time every month. He believes and understands that his credit record with all of his creditors is excellent, so Mr. Kinard could not imagine what the problem could be.

53.     Much to Mr. Kinard's shock and dismay, the State Farm insurance agent informed him that his insurance application was halted by State Farm because his LexisNexis consumer report indicated that he was "deceased" and had no credit score.

54.     While confused about how such a mistake could happen, and also fearful of what it meant to his ultimate ability to secure automobile insurance and future credit opportunities, Mr. Kinard genuinely believed that such an obvious error would have to be fairly easily corrected. He

kept his fingers crossed that after providing whatever proof State Farm needed to override this mistake he could proceed with obtaining the automobile insurance policy.

55.     Accordingly, Mr. Kinard provided copies of his current driver's license and his Social Security card in an effort to prove that he was, in fact, alive. Nevertheless, the State Farm insurance agent advised that it could not approve him for insurance because of the "deceased" notation appearing on his LexisNexis consumer report.

**Plaintiff's First Telephonic Dispute with LexisNexis in June 2019**

56.     In or about May 2019, still frustrated that State Farm had denied him insurance because of his LexisNexis consumer report, Mr. Kinard telephoned LexisNexis and spoke to a representative. Mr. Kinard explained his issue in great detail and informed the representative that LexisNexis had been reporting him as "deceased" on his consumer report and that he was recently denied insurance as a result of its inaccurate reporting. Mr. Kinard stated that he was disputing the "deceased" notation on his LexisNexis consumer report and asked that it be corrected as soon as possible.

57.     LexisNexis failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received the notice of dispute from Mr. Kinard.

**LexisNexis's Response to Plaintiff's May 2019 Dispute**

58.     On or about June 11, 2019, Mr. Kinard received mail correspondence from LexisNexis, which indicated that LexisNexis forwarded Plaintiff's dispute of the inaccurate deceased indicator appearing on his LexisNexis consumer report to non-party, Equifax.

59.     LexisNexis admitted in this mail correspondence that it did not participate in the dispute resolution process other than to initiate and forward Plaintiff's dispute to Equifax.

60.     LexisNexis's written correspondence included dispute results from Equifax, dated June 6, 2019, indicating that an Automobile Acceptance Corp tradeline appearing on Plaintiff's Equifax credit report with a "Deceased" indicator had been reinvestigated by Equifax and verified as accurate and belonging to Plaintiff.

61.     LexisNexis failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received the notice of dispute from Mr. Kinard, in violation of 15 U.S.C. § 1681i.

62.     LexisNexis failed to heed Mr. Kinard's actual notice of the erroneous "deceased" notation and continued to report him as deceased.

63.     As a result of the "deceased" annotation, Defendant made it practically impossible for Mr. Kinard to obtain insurance.

64.     At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

65.     At all times pertinent hereto, the conduct of the Defendant, as well as that of its agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Mr. Kinard herein.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

66.     Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-65 as if fully stated herein.

67.     The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

68.     On at least one occasion, Defendant assembled, merged, and resold a patently false consumer report concerning Plaintiff.

69.     Despite actual and implied knowledge that Plaintiff is not dead, Defendant readily sold such false consumer report to one or more third party, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

70.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports and credit files it published and maintains concerning Plaintiff.

71.     As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit/insurance; loss of the ability to purchase and benefit from his credit; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit/insurance denials.

72.     Defendant's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant

to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

73.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform Reasonable Reinvestigation**

74.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-65 as if fully stated herein.

75.    The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limitation for the completion of such an investigation. *Id.*

76.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact, inaccurate, or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

77.    In 2019, Plaintiff initiated a telephonic dispute with Defendant that it correct and/or delete a specific item in his consumer report that is patently inaccurate, misleading, and highly damaging to him, namely, references to him being "deceased" and having no credit score.

78.    Either Defendant conducted *no* investigation of Plaintiff's dispute, or such investigation was so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's consumer report.

79.     Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received the notice of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's consumer report.

80.     As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit/insurance; loss of the ability to purchase and benefit from his credit; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit/insurance denials.

81.     Defendant's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

82.     Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

a)      Determining that Defendant negligently and/or willfully violated the FCRA;

b)      Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

15

c)      Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d)      Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

83.      Plaintiff demands a trial by jury.


Dated: May 13, 2021

JOSEPH P. MCCLELLAND, LLC

*/s/Joseph P. McClelland*
Joseph P. McClelland, Esq.
Attorney I.D. #483407
545 N. McDonough Street, Suite 210
Decatur, Georgia 30030
Telephone: (770) 775-0938


Hans W. Lodge*
hlodge@bm.net
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 607-7794
Fax: (612) 584-4470
*Pro hac vice* forthcoming

*ATTORNEYS FOR PLAINTIFF*

16